

In The

Court of Appeals

Seventh District of Texas at Amarillo

No. 07-15-00442-CV

IN THE INTEREST OF D.E.B., S.B., J.B., CHILDREN

On Appeal from the County Court at Law No. 1
Randall County, Texas
Trial Court No. 10656-L1, Honorable James W. Anderson, Presiding

May 13, 2016

MEMORANDUM OPINION

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

Appellee, the Texas Department of Family and Protective Services, sought termination of the parental rights of the mother of D.E.B., S.B., and J.B.[1] After a two-day bench trial, the associate judge found termination was not in the best interest of the children. The Department obtained a de novo hearing before the referring court.[2] Following the hearing, the referring court ordered termination of the mother's parental

---

[1] To protect the children's privacy, we will identify appellant as "the mother," and the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014); TEX. R. APP. P. 9.8 (a),(b). The parental rights of the father of S.B. and J.B. were terminated by a 2006 order.

[2] *See* TEX. FAM. CODE ANN. § 201.015 (West 2015).

rights to S.B. and J.B. but not D.E.B. The mother challenges the sufficiency of evidence supporting the court's finding that termination was in the best interest of S.B. and J.B. We will affirm.

Background

At the time of the May 2014 trial before the associate judge, D.E.B. was age fifteen, S.B. was twelve, and J.B. almost ten. The children had been in the Department's custody since November 2013. But evidence at trial indicated S.B. and J.B. also were in the Department's care from September 2005 until August 2008 and D.E.B., from September 2005 until June 2010.

A Department investigator testified the Department had a history of "many, many, many cases" involving the mother and her family. During 2006, the mother became involved with J.B. Hayhurst, who had recently been released from prison. They later married. In 2012, Hayhurst was convicted of manslaughter and at the time of trial was serving a ten-year sentence. The mother pled guilty to the offense of tampering with a witness in Hayhurst's prosecution. She was sentenced to five years' deferred adjudication community supervision.

In 2007, the mother was placed on five years' deferred adjudication community supervision for negligently abandoning or endangering a child. The charge was brought because the mother allowed her former husband, B.B., to return to the home with the children after he pled guilty to sexually assaulting the mother's fourteen-year-old cousin. It was then that B.B. sexually assaulted D.E.B. The mother testified she "was in denial," and did not believe D.E.B. when she reported the assault to her. The children were

2

removed from the home and B.B. was convicted and imprisoned. According to the testimony of a psychologist who treated S.B., D.E.B. later blamed S.B. for the family disarray because D.E.B. was sexually abused by S.B.'s father, B.B.

Another Department worker testified that in 2010 D.E.B. brought a cellphone to school containing pornographic images of several people, including the mother and J.B. Hayhurst. D.E.B. was removed from the mother's care for some six months. In the worker's opinion, the mother did not seem to "grasp the inappropriate nature of the situation." Later, D.E.B. was improperly touched while staying with a friend. The mother learned of the occurrence but took no action after D.E.B. asked her to keep it a secret. She testified that by remaining silent she hoped to gain her daughter's trust.

During 2012 the Department again was involved with the mother and her children based on reported inappropriate sexual contact between S.B., then age nine, and her eleven- and twelve-year-old cousins. According to the Department, the mother did not take steps to protect S.B. Juvenile authorities became involved with the cousins. The mother reported to a psychologist that, at about the same time, D.E.B. was hospitalized for suicidal "comments and gestures." Later, D.E.B. allegedly "lunged" at the mother with a knife and juvenile authorities became involved. She was apparently placed on juvenile probation for aggravated assault.

The mother was jailed in the summer of 2013 under the witness-tampering charge. The children were left in the care of the mother's sister, who was the mother of the cousins involved in the 2012 incident. While the aunt was caring for S.B. and J.B., another of her children exposed them to pornography.

3

An August 2013 referral to the Department alleged the mother was leaving the children alone while she worked. When an investigator spoke with J.B. and S.B. at school, he observed J.B. smelled, was "very dirty" and wore unclean clothes.

At an early-September visit to the mother's home, the investigator saw the residence was clean, but "smelled like animal urine and feces." The home was owned by the mother's father-in-law who allowed her to live there without paying rent. The mother told the worker she had no one to watch J.B. and S.B. other than thirteen-year-old D.E.B. At the time D.E.B. remained on juvenile probation. The worker obtained some financial assistance for the mother and also helped with arranging childcare. A bed was obtained for J.B. Nevertheless, the mother's home utilities were disconnected in October.

In November 2013, the Department received three new intake reports concerning the mother and the children. The first alleged neglectful supervision of the children, the second involved J.B.'s behavior at school, and the third concerned possible exposure of J.B. "to things of a sexual nature." In an unscheduled home visit, the investigator noted the residence was unclean with dog feces on the floor and a bad odor. Because there was no electricity, the home had no heat or means to refrigerate food. At that time the mother worked a night shift and left the children alone. The mother testified she took the children to a shelter to avoid the cold. From there, the Department removed the children.

J.B. was initially placed in a foster home in Lubbock but had to be removed and placed in a children's shelter after he "acted out sexually against another child." D.E.B.

and S.B. were placed in a foster home in Muleshoe. D.E.B. was moved to a different facility because of her frequent threats to harm herself.

In January 2014, the mother was referred for counseling. According to this counselor's testimony, her record concerning the mother dated back at least to 2010. The counselor believed the mother was more clinically depressed in 2014 than in the past. She described the mother as angry and resentful. The mother did not acknowledge responsibility for the events that led to her children's removal, and resisted the counselor's attempt to create a plan for their future protection because she found no shortcomings with her parenting. After four or five sessions, the counselor terminated the mother as a client for failure to make progress and referred her back to the Department.

The mother was referred to another counselor who conducted twelve sessions between March and November 2014. She indicated the mother kept their appointments, but grew angry and defensive when confronted with the reasons the children were in the Department's care. In the counselor's opinion, by November the mother had made progress in areas such as job stability and her personal appearance. Some improvement was also noted with her depression. But, the counselor said, the mother was still not thinking through the consequences of her actions and was not willing to make changes in her behavior and decision-making. The counselor had "serious concerns" about the mother's ability to meet the emotional and physical needs of her three children. In her opinion, the mother had "the mindset if nobody knows about it, it's not wrong. I can do what I want, as long as nobody finds out, and that is almost a core belief for her . . . ."

5

The court ordered a service plan which, among other things, required the mother to pay child support and medical support. She failed to comply with this obligation and admitted at trial that she did not make it the priority she should have. She completed a required psychological evaluation but did not immediately comply with the treatment recommended. The mother also was ordered to maintain a safe and stable home. A Department worker testified multiple home visits beginning in February 2014 revealed unsanitary conditions including mouse and dog feces, roaches, and a general uncleanliness. During her case-in-chief, the mother presented a number of recently-made photographs depicting improved cleanliness in her home.

A psychologist who evaluated the mother in 2007, 2008 and 2014 diagnosed the mother with a bipolar disorder, primarily of a depressive type. This disorder, he believed, would interfere with her ability to manage her three children. The psychologist explained that while improvement might be possible over years the mother did not seem motivated to obtain treatment and make changes. In his opinion, the mother will "need a lot of assistance, even in maintaining any kind of relationship with her children, much less caring for them." He believed her depression had worsened from 2008 to 2014. He testified that he could not "imagine a situation in which she would be able to take care of these three troubled children by herself in the foreseeable future."

There was evidence J.B. suffered significant emotional disorders, requiring daily medication. The investigator testified that before J.B.'s removal he found indications the boy was not receiving his medication. A clinical psychologist testified she diagnosed J.B. with "other specified bipolar and related disorder with mood congruent psychotic features of moderate severity," as well as oppositional defiance disorder. According to

6

the psychologist, J.B. required residential treatment for children with serious sexual disorders. The psychologist believed J.B.'s prognosis would be improved with residential placement and counseling, but would be hindered if he is unable to remain in a stable environment.

The evidence showed S.B. was diagnosed with A.D.H.D., also requiring medication. S.B.'s treating psychologist spoke of the danger to a child like S.B. of her encounter with sexually inappropriate photographs on her mother's cellphone. In the psychologist's opinion, S.B. needs a structured, stable environment. The home should have "very clear boundaries about what is appropriate sexually and what is not. [S.B.] needs to know that she's also going to be protected from any kind of sexual overture . . . ." The therapist could not say whether the mother will be able to meet these needs, but cautioned S.B. must have such an environment if she is to "have a successful teenage life without becoming a victim of sexual abuse or becoming a really early promiscuous teen." During a supervised visit about a month before trial, while playing with the mother's cellphone, S.B. viewed sexually inappropriate photographs stored on the phone by the mother.

The Department planned to transfer the children to the adoption unit if parental rights were terminated. According to the children's caseworker, J.B. and S.B. could potentially remain in their current foster placements "up to adoption." There was no evidence of anyone standing by to adopt the children. On the other hand, if the children were returned from the Department's care, the mother disclosed some of her plans. The evidence showed the mother left home for work around 5:00 a.m. each day, and planned for a neighbor to come into the home to make sure the children got to the

school bus.  For the summer, the mother wanted to enroll the children in an agency day-care program but admitted the cost for two children would be too expensive.  She also had lined up a relative babysitter but it was shown this person's son was in the Department's care.

By the time of trial, the mother had maintained steady employment for about nine months, acknowledged to be a positive accomplishment.  The Department was not aware of a time after removal that the mother's utilities were disconnected.  The mother testified she no longer has delinquent bills and has been able to reduce her debt.  She completed a required parenting course but in the worker's opinion, based on subsequent interaction with the children, did not benefit from the instruction.

The mother testified she was not ready to care for all three children but believed she could handle S.B.  In counseling sessions with the family therapist, J.B. vacillated between wanting to return home and wanting not to go home.  Near the time of trial he seemed to favor going home to see if his stepfather would be released from prison.  A CASA volunteer informed the court that J.B. told her "multiple times" he did not want to return home.  According to the testimony of a treating psychologist, S.B. and the mother were bonded.  The psychologist agreed that throughout the case S.B. consistently expressed her desire to return home to the mother.

## Analysis

The Family Code permits a trial court to terminate parental rights if the Department proves by clear and convincing evidence that the parent committed an action prohibited under section 161.001(b)(1) and termination is in the child's best

8

interest. TEX. FAM. CODE ANN. § 161.001(b)(1), (2) (West 2015); *Holley v. Adams,* 544 S.W.2d 367, 370 (Tex. 1976).

The trial court here found termination was warranted by predicate-ground findings under Family Code sections 161.001(b)(1)(D), (E), (F), (L) and (O) and a best-interest finding. On appeal the mother concedes the trial court did not err by its predicate-ground findings under subsections (D), (E) and (O). She recognizes also that only one predicate-ground finding, accompanied by a best-interest finding, is necessary to authorize an order of termination. *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003). For that reason, discussion of the evidence supporting the court's findings on grounds (L) and (F) is unnecessary to our disposition of the appeal. TEX. R. APP. P. 47.1.

We turn then to her contention that the evidence was legally and factually insufficient to support the finding that termination of her parental rights to S.B. and J.B. was in their best interest.

The Due Process Clause of the United States Constitution and section 161.001 of the Texas Family Code require application of the heightened standard of clear and convincing evidence in cases involving involuntary termination of parental rights. *In re E.N.C.,* 384 S.W.3d 796, 802 (Tex. 2012); *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002). Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2014); *In re C.H.,* 89 S.W.3d 17, 25-26 (Tex. 2005).

In applying the clear and convincing standard under our legal sufficiency standard, we consider all the evidence in the light most favorable to the court's finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re E.N.C.,* 384 S.W.3d at 802 (citing *In re J.F.C.,* 96 S.W.3d at 266). To give appropriate deference to the factfinder's conclusions, we must assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re E.N.C.,* 384 S.W.3d at 802. As a corollary to this requirement, an appellate court should also disregard all contrary evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then the evidence is legally insufficient. *Id.*

In a factual sufficiency review, a court of appeals must give due consideration to the evidence the factfinder could reasonably have found to be clear and convincing. *In re C.H.*, 89 S.W.3d at 25. We determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* In doing so we consider whether disputed evidence is such that a reasonable factfinder could not have resolved the dispute in favor of its finding. *Id.* If, in light of the entire record, the evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that it could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *In re J.F.C.,* 96 S.W.3d at 266.

When assessing the best interest of a child, a court may consider the non-exhaustive factors announced in *Holley,* 544 S.W.2d at 371-72. These include: (1) the

desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

The *Holley* factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *In re C.H.,* 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* The evidence supporting the statutory grounds for termination may also be used to support a finding that the best interest of the children warrants termination of the parent-child relationship. *In re C.H.,* 89 S.W.3d at 28. The *Holley* factors focus on the best interest of the child, not that of the parent. *Patterson v. Brist,* 236 S.W.3d 238, 240 (Tex. App.—Houston [1st Dist.] 2006, pet. dismissed); *Dupree v. Texas Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).

The law recognizes a strong presumption that the best interest of a child will be served by preserving the parent-child relationship. *Swate v. Swate,* 72 S.W.3d 763, 767 (Tex. App.—Waco 2002, pet. denied). But it recognizes also that the prompt and

permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2015); *In re J.F.,* No. 02-08-0183-CV, 2009 Tex. App. LEXIS 2130, at *17 (Tex. App.—Fort Worth Mar. 26, 2009, pet. denied) (mem. op.).

The factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In re T.L.S.,* 170 S.W.3d 164, 166 (Tex. App.—Waco 2005, no pet.); *Williams v. Williams,* 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *see Ray v. Burns,* 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue").

The record depicts the mother's inability, over a long period of time, to provide for the physical and emotional needs of her children and to protect them from emotional and physical danger. As noted, she concedes the court's finding of the endangering conduct and conditions to which her children have been subjected under her care. TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). The mother was twice placed on community supervision and S.B. was exposed to sexual offenders and the mother's own irresponsible cellphone pictures. Evaluating the best interest of the younger children, the court as well could have taken into account the sexual assault D.E.B. endured when her mother brought B.B. back into their home. The evidence of endangering conduct and conditions strongly supports the trial court's best interest finding.

The mother also concedes the correctness of the trial court's finding termination was warranted under subsection (O) of section 161.001(b)(1), which required clear and convincing evidence the mother failed to comply with the provisions of a court order that

specifically established the actions necessary for her to obtain the return of S.B. and J.B. after their removal for abuse or neglect. TEX. FAM. CODE ANN. § 161.001(b)(1)(O). The finding is pertinent also to the best interest determination. The mother's failure to complete successfully the service plan ordered in the current proceeding comes at the conclusion of her substantial history with the Department, during which she demonstrated an inability or unwillingness to accept the benefit of counseling and related assistance provided her. As one counselor told the court, the mother's conduct reflected a philosophy holding, "I can do what I want, as long as nobody finds out." The record demonstrates the detrimental impact of such an attitude on her children.

The mother's plans for S.B. and J.B. support the court's best interest finding. She has a history of leaving the younger children in the care of D.E.B. The mother's determination to maintain employment is commendable, but even after those efforts she acknowledges she currently can care only for S.B. But S.B., her psychologist testified, needs a stable and structured environment with clear boundaries. Even with the recent improvements in her finances and employment, the court had reason to doubt the mother's ability to provide that kind of environment for S.B. And, in her plan, J.B.'s permanent placement must await further improvement in the mother's parenting capabilities, while he remains in foster care.

There is evidence that S.B. and perhaps J.B. want to return to the mother's home. While the desires of the children is a proper factor in the best interest analysis, nothing in this record suggests it should be the controlling factor here. *See In re W.S.M.,* 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.) ("The child's love of his parents cannot compensate for the lack of an opportunity to grow up in a normal

and safe way equipped to live a normal, productive, and satisfying life").  The court was not required to consider that the best interest of S.B. and J.B. would be served by leaving one or both children in the uncertainty of foster care while the mother and the children attempt to work through the emotional and medical issues shown by this record.

After viewing all of the evidence in the light most favorable to the best interest finding, we conclude the evidence was sufficiently clear and convincing that a reasonable fact finder could have formed a firm belief or conviction that termination of the parent-child relationship between the mother and S.B. and J.B. was in the children's best interest.  We further conclude that, viewed in light of the entire record, any contrary or disputed evidence could have been reconciled in favor of the trial court's best interest finding or was not so significant as to prevent the trial court from forming a firm belief or conviction that termination was in their best interest.  Thus, the evidence was legally and factually sufficient to support the best interest finding.  We overrule the mother's issue contending otherwise.

Conclusion

Having resolved against the mother the only issue necessary to our disposition of the appeal, we affirm the order of the trial court.

James T. Campbell
Justice